NOT DESIGNATED FOR PUBLICATION

No. 120,202

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee/Cross-appellant*,

v.

RICKY T. WIRTHS,
*Appellant/Cross-appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JAMES R. FLEETWOOD, judge. Opinion filed July 2, 2020. Affirmed.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellant/cross-appellee.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee/cross-appellant.

Before BRUNS, P.J., GREEN, J., and TIMOTHY J. CHAMBERS, District Judge, assigned.

PER CURIAM: Ricky T. Wirths appeals his attempted first-degree murder conviction, arguing that we should reverse his conviction and remand for a new trial for two reasons. First, he argues that the trial court erred by failing to instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted first-degree murder. Second, he argues that the prosecutor committed error during closing arguments by misstating facts, misstating law, commenting on his credibility, and inflaming the passions of the jury.

1

The State cross-appeals. At sentencing, the trial court denied the State's motion to impose an upward durational departure sentence on Wirths. Now, the State asks us to rule whether it can move the trial court to impose an upward durational departure sentence again should we reverse Wirths' conviction, remand for a new trial, *and* Wirths be reconvicted upon remand.

Nevertheless, for reasons set forth below, we conclude that neither Wirths' arguments nor the State's arguments are persuasive. Thus, we affirm Wirths' attempted first-degree murder conviction.

Courtney Holloway was a Kansas Department of Revenue (KDOR) warrant execution officer. On September 19, 2017, around 11 a.m., Holloway served a tax warrant on Wirths. For nearly a year, the KDOR had been working with Wirths to pay his construction company's $680,000 in unpaid retail sales taxes. Wirths had hired an accounting firm to help him negotiate with the KDOR and pay his back taxes. But as of September 19, 2017, Wirths had paid none of his back taxes. As a result, the warrant Holloway served on Wirths allowed the KDOR to seize all money and property associated with Wirths' construction company.

When Holloway served the warrant on Wirths, Wirths was upset because he believed that the accounting firm had been working with the KDOR to pay his back taxes. While Holloway executed the warrant, Wirths called the accounting firm; the accounting firm admitted that it had erred in its handling of Wirths' case. Because of the accounting firm's error, Holloway decided to seize only a couple of items that morning— Wirths' pickup truck and the money in Wirths' wallet. Then, Holloway explained to Wirths that if he completed certain tasks, including filling out the necessary paperwork, the KDOR would return his seized property. At the end of their encounter, Wirths and Holloway spoke for a few minutes and shook hands. Then, Wirths thanked Holloway for

not taking all of his property and agreeing to work with him on payment of his back taxes.

After Holloway seized Wirths' pickup truck, he returned to the KDOR office. Meanwhile, Wirths borrowed his parents' pickup truck so he could continue working on his current construction project. Wirths then drove his parents' pickup truck to a gas station. When he attempted to fill the truck with gasoline, however, his debit card was declined. Thus, Wirths called his bank. It was at this point Wirths learned that the KDOR had also seized all the money in his bank account—an account containing $54,000. Unbeknownst to Wirths, the KDOR executed a bank levy while Holloway had executed the tax warrant that morning.

Upon learning about the bank levy, Wirths decided to go to the KDOR office to speak to Holloway. The KDOR office was located about a mile away from the gas station where Wirths attempted to buy gasoline. Wirths arrived at the KDOR office around 2:30 p.m. When he arrived, he told the KDOR employee working at the front desk that he was there to speak to Holloway. This employee "buzzed" Wirths inside the building. Within minutes, Holloway came to the front of the KDOR office to speak with Wirths.

At this juncture, Holloway and Wirths had a short conversation. It is disputed exactly what Holloway and Wirths said to one another during this conversation. Yet, it is undisputed that at the end of their conversation, Wirths pulled a .45 caliber handgun out of a black portfolio that he had carried into the KDOR office. Then, from about 3-4 feet, Wirths shot Holloway five times—once in the right hand, twice in the right arm, once in the right side of his chest, and once in the left thigh.

Upon shooting Holloway, Wirths left the KDOR office, got into his parents' pickup truck, and drove to his house. On the way to his house, Wirths called a couple of

people, telling them that he had "lost it" and "just killed a guy." Ultimately, Wirths turned himself into the police for shooting Holloway later that day.

Despite suffering severe internal damage, Holloway survived his gunshot wounds. As a result, the State charged Wirths with attempted first-degree murder, a severity level 1 person felony. See K.S.A. 2019 Supp. 21-5402(a)(1); K.S.A. 2019 Supp. 21-5301.

Eventually, Wirths' case proceeded to jury trial. At his trial, Wirths admitted that he shot Holloway. But he denied that he planned to shoot Holloway when he entered the KDOR office. Instead, Wirths asserted that he became so upset during his conversation with Holloway, that he shot Holloway "in the heat of the moment."

At trial, both Holloway and Wirths testified about their conversation at the KDOR office. Holloway testified that his conversation with Wirths went as follows:

"When I arrived up front Mr. Wirths came to the desk. We were standing across from each other and he said, 'I thought we had a deal.' And I said, 'We did. What's the problem?' And he said, 'You took all my money out of my bank account.' And I explained to him that that had already been done that morning. It wasn't something that I did after the fact, it had already been done. And he said, 'You're going to cause my payroll checks to bounce. You're going to cause my'—'cause me to have a bad reputation with my creditors.' And he had a portfolio that zips, and as he's making these statements about the trouble that this levy's going to cause him[,] he begins to unzip the portfolio. And I'm thinking he's going to pull out some type of paperwork for me, but when he unzips the portfolio about halfway I see the handle of a gun sticking out."

But Wirths testified that the conversation had a different tone. During his direct examination, Wirths described Holloway as rude and arrogant during their conversation:

"Q. [By defense attorney] When you explained that [you could not make payroll] to Mr. Holloway what happens?

4

"A. [By Wirths] He told me that those people didn't concern him.

"Q. Did he indicate to you that there was something you could do to get the truck back?

"A. When I asked him about the truck, I said, 'Well, they don't concern you,' I said, 'but how am I supposed to make a living without my truck? How long is it going to take to get my truck back?' He said, 'Mr. Wirths, you're not going to get your money back and you're not going to get your truck back.' And I said, 'But you told me in my driveway that I could get my truck back.' He said, 'I said that to calm the situation at the time.'

"Q. So then what happened?

"A. I turned to leave.

"Q. Then what happened?

"A. He said[,] 'Ricky' and I turned around. And he said, 'I told you I would win,' then things went crazy. I—I would like to tell you why I did what I did. I've never said I didn't shoot Mr. Holloway. I did shoot Mr. Holloway. I can't tell you how many times I shot Mr. Holloway, and I can't tell you why I shot Mr. Holloway that many times."

As for the handgun Wirths carried into the KDOR, the State presented testimony and photographs from a crime scene investigator who recovered the handgun. The handgun, as well as two loaded magazines, were inside the black portfolio. And the black portfolio was on the passenger seat of Wirths' parents' pickup truck. The crime scene investigator also recovered packaging material for the black portfolio. The packaging material was in the otherwise empty bed of Wirths' parents' pickup truck. The State argued that based on the packaging material's presence, Wirths likely bought the black portfolio immediately before he went into the KDOR office so he could sneak his handgun into the building.

Nevertheless, Wirths testified that he had owned the black portfolio since Christmas 2016. He further testified that he had been carrying his loaded handgun in the black portfolio since receiving it at Christmas. When testifying on Wirths' behalf, Kourtnie Robertson, Wirths' then ex-girlfriend, confirmed that Wirths always carried his handgun inside the black portfolio. She added that Wirths carried the handgun because

some people had stolen construction equipment from him. Even so, during her cross-examination, Robertson admitted that she initially told the police that she did not know that Wirths owned a handgun. Robertson alleged that she told the police this by mistake because she was very distraught during her police interview. Also, Robertson admitted that after the KDOR seized Wirths' truck but before Wirths shot Holloway, Wirths came home and rummaged around for something.

Ultimately, the jury convicted Wirths of attempted first-degree murder. Then, the trial court sentenced Wirths to the aggravated presumptive sentence for Wirths' criminal history, which was 165 months' imprisonment followed by 36 months' postrelease supervision. When imposing this sentence, the trial court denied the State's motion for an upward durational departure sentence.

Wirths timely appealed. The State timely cross-appealed.

*Did the Trial Court Err in Instructing the Jury?*

Wirths was charged and convicted of attempted first-degree murder. At trial, the trial court instructed the jury on attempted first-degree murder and attempted intentional second-degree murder as a lesser included offense of attempted first-degree murder. But it denied Wirths' request for an attempted voluntary manslaughter instruction because it found that the evidence did not "support a lesser included charge of voluntary manslaughter."

On appeal, Wirths argues that the trial court committed reversible error by denying this request. He contends that attempted voluntary manslaughter instruction was both legally appropriate and factually appropriate. In making his factual appropriateness argument, Wirths argues that the evidence supports that he shot Holloway upon a sudden quarrel or in the heat of passion. Yet, Wirths' argument also hinges on challenging our

6

Supreme Court's interpretation of K.S.A. 2019 Supp. 21-5404(a)(1)—the voluntary manslaughter statute. Despite our Supreme Court's holdings to the contrary, he asserts that legally sufficient provocation is not an element of voluntary manslaughter.

The State counters that our Supreme Court has correctly interpreted K.S.A. 2019 Supp. 21-5404(a)(1) as requiring legally sufficient provocation. Then, the State asserts that because Holloway's statements to Wirths at the KDOR office did not provide Wirths with legally sufficient provocation to injure Holloway, the trial court correctly denied Wirths' request to instruct the jury on attempted voluntary manslaughter.

*Standard of Review*

Our review of alleged jury instruction errors consists of three steps:

"'(1) determining whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
(2) considering the merits of the claim to determine whether error occurred below; and
(3) assessing whether the error requires reversal, i.e., whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Under the second step of our standard, we must first determine if the disputed instruction was legally appropriate. Then, if the disputed instruction was legally appropriate, we must consider whether the disputed instruction was factually appropriate. *McLinn*, 307 Kan. at 318. And when considering the factual appropriateness of the disputed instruction, we must review all the trial evidence in the light most favorable to the defendant while exercising unlimited review. 307 Kan. at 318, 325.

7

*Factual Appropriateness*

Here, the parties agree that Wirths preserved his jury instruction argument by objecting to the trial court's refusal to give the attempted voluntary manslaughter instruction below. They also agree that the attempted voluntary manslaughter instruction was legally appropriate as a lesser included offense of attempted first-degree murder. See *State v. Harris*, 293 Kan. 798, 806, 269 P.3d 820 (2012) (holding that attempted voluntary manslaughter is a lesser included offense of attempted first-degree murder). As a result, we may now consider whether Wirths' request for an attempted voluntary manslaughter instruction as a lesser included offense of attempted first-degree murder was factually appropriate. To do this, however, we must first review the elements of voluntary manslaughter.

K.S.A. 2019 Supp. 21-5404(a)(1) provides that a person commits voluntary manslaughter if that person "knowingly" kills another "[u]pon sudden quarrel" or "in the heat of passion." "Knowingly" as stated under K.S.A. 2019 Supp. 21-5404(a)(1) means that the person was "aware that such person's conduct [was] reasonably certain to [kill]." K.S.A. 2019 Supp. 21-5202(i).

Next, to commit voluntary manslaughter "upon a sudden quarrel" or "in the heat of passion," the defendant must be responding to "legally sufficient provocation." *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014). We use an objective test to determine whether legally sufficient provocation existed, which is whether the provocation would cause a reasonable person to act out of passion instead of reason. *State v. Bernhardt*, 304 Kan. 460, 475, 372 P.3d 1161 (2016) "'Mere words or gestures . . . do not constitute legally sufficient provocation.'" *State v. Campbell*, 308 Kan. 763, 776, 423 P.3d 539 (2018) (quoting *Hayes*, 299 Kan. at 864). Instead, evidence of an aggressive act, physical threat, or physical assault coupled with insulting language is necessary for the crime of

8

voluntary manslaughter. *State v. Brownlee*, 302 Kan. 491, 513, 354 P.3d 525 (2015) (citing *State v. Stallings*, 246 Kan. 642, 649, 792 P.2d 1013 [1990]).

Also, our Supreme Court has described a "sudden quarrel" as "'[a]n altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons.'" *State v. Ruiz-Ascencio*, 307 Kan. 138, 142, 406 P.3d 900 (2017). This "altercation" must have been "unforeseen" and "happening without warning.'" 307 Kan. at 142. On the other hand, our Supreme Court has described "heat of passion" as an "'intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" *Hayes*, 299 Kan. at 864. Thus, the crime of attempted voluntary manslaughter requires a person to take an overt act towards killing another after an unforeseen and angry dispute or after a vehement excitement while having the awareness that his or her actions are reasonably likely to kill this other person.

Turning our attention back to the parties' underlying argument, we must now consider whether the evidence established that Wirths was entitled to an attempted voluntary manslaughter instruction. Wirths argues that the trial court erred by denying his request because the evidence supported that he shot Holloway upon a sudden quarrel or in the heat of passion. In making his argument, Wirths challenges our Supreme Court's decision in *Hayes*, where the court held the following:

> "[I]n order to reduce a homicide from murder to voluntary manslaughter, there must be
> an adequate provocation that deprives a reasonable person of self-control and causes that
> person to act out of passion rather than reason. Mere words or gestures, however
> offensive, do not constitute legally sufficient provocation for a finding of voluntary
> manslaughter." 299 Kan. at 866.

Wirths argues that the *Hayes* court's holding is errant because nothing within the plain language of K.S.A. 2019 Supp. 21-5404(a)(1) addresses "the concept of provocation." He

9

thus argues that "legally sufficient provocation" is a "judicially created element" that we should not consider when determining the factually appropriateness of the attempted voluntary manslaughter instruction in his case.

Nevertheless, we are duty-bound to follow our Supreme Court's precedent absent some indication that our Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). Our Supreme Court has held that legally sufficient provocation must exist to reduce a murder charge to voluntary manslaughter for over a century. See *State v. Buffington*, 71 Kan. 804, Syl. ¶ 5, 81 P. 465 (1905). Also, just this year, our Supreme Court reaffirmed its position, holding that "[t]he core elements of voluntary manslaughter are an intentional killing and legally sufficient provocation." *State v. Parker*, 311 Kan. ___, ___, 459 P.3d 793, 801 (2020). The *Parker* court further reaffirmed that mere words and gestures, however offensive, do not constitute legally sufficient provocation under K.S.A. 2018 Supp. 21-5404(a)(1). 459 P.3d at 801.

As a result, there is no indication that our Supreme Court is moving away from its holding in *Hayes* that "[t]he key elements of voluntary manslaughter under K.S.A. 21-3403 [now K.S.A. 2019 Supp. 21-5404] are an intentional killing and legally sufficient provocation." 299 Kan. at 864. Nor is there any indication that our Supreme Court is moving away from its position that mere words and gestures do not constitute legally sufficient provocation. Because we are duty bound to follow our Supreme Court precedent, we reject Wirths' argument that he need not show legally sufficient provocation in establishing the factual appropriateness of his attempted voluntary manslaughter jury instruction request.

With this in mind, it is readily apparent that the attempted voluntary manslaughter instruction was factually inappropriate because legally sufficient provocation did not exist. When viewed in the light most favorable to Wirths, the evidence indicates that

10

during Wirths and Holloway's conversation at the KDOR office, Holloway was rude and arrogant. The evidence indicates that Holloway told Wirths that he was not going to get his money or personal property back. And the evidence indicates that just as Wirths was turning to leave the KDOR office, Holloway told Wirths, "Ricky, I told you I would win." Based on Wirths' own testimony, it was this final comment that made him lose control and start shooting.

So, even when viewed in the light most favorable to Wirths, no evidence indicated that Holloway "'engaged in aggressive acts, physical threats, [or a] physical assault with insulting language.'" See *Brownlee*, 302 Kan. at 513 (citing *Stallings*, 246 Kan. at 649). Instead, according to Wirths' own testimony, it was Holloway's arrogant and rude comments, specifically Holloway's comment, "Ricky, I told you I would win," that provoked him to shoot. Although Holloway's comments were rude and arrogant, his comments were still mere words. In turn, because our Supreme Court has determined that mere words do not constitute legally sufficient provocation for a voluntary manslaughter finding, the trial court correctly found that an attempted voluntary manslaughter jury instruction was factually inappropriate under the facts of Wirths' case. See *Hayes*, 299 Kan. at 866. Thus, we reject Wirths' argument that the trial court's refusal to give the attempted voluntary manslaughter instruction constituted reversible error.

*Did the Prosecutor Commit Error During Closing Arguments?*

Next, Wirths argues that the prosecutor erred by making certain statements during closing arguments. Specifically, Wirths argues that the prosecutor misstated the evidence, minimized the definition of premeditation, attacked his credibility, and inflamed the passions of the jury when making the following statements: (1) that "[h]is cause was to show [the jury] why he shouldn't have to pay taxes, to show [the jury] what happened when [the KDOR tried] to make him accountable"; (2) that premeditation exists when there is "anything more than that instantaneous thought"; (3) that "[m]ost people don't

11

come in and just [fully confess and admit their sins] on the stand. If they did that, they'd just come in and say, okay, I'm guilty"; and (4) that he could not explain why he took his handgun to the KDOR office "because sometimes the truth is too hard sometimes." Wirths then contends that the prosecutor's errant statements prejudiced the jury against him, affecting the outcome of his trial. So, Wirths asks us to reverse his attempted first-degree murder conviction and remand for a new trial.

Yet, the State counters that when the prosecutor's statements are viewed in context, the prosecutor did not misstate facts, misstate law, wrongly attack Wirths' credibility, or inflame the passions of the jury. Alternatively, the State contends that any error resulting from the prosecutor's comments was harmless beyond a reasonable doubt.

*Standard of Review*

Appellate courts review claims of prosecutorial error under a two-step process:

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

*Wirths' Cause*

Wirths first argues that the prosecutor misstated facts in evidence and attempted to inflame the passions of the jury by making the following statement during closing arguments:

> "[Wirths] talks about his cause and what it was he was doing [at the KDOR office]. He was standing up. He was showing everyone what his cause was. His cause was to show you why he shouldn't have to pay taxes, to show you what happened when you try to make him accountable."

In making this argument, Wirths stresses that he never claimed that he should not have to pay taxes. Instead, he claimed that he should "not have to pay retail sales taxes on materials for [tax-]exempt organizations."

The evidence at Wirths' trial supported that persons do not have to pay retail taxes on materials bought for tax-exempt organizations. Thus, if the KDOR sought taxes on materials Wirths bought while doing construction projects for tax-exempt organizations, the KDOR was in the wrong. Additionally, at trial, Wirths testified that he did not owe taxes because the KDOR sought taxes on materials that he had bought while doing construction projects for tax-exempt organizations.

Nevertheless, the evidence at Wirths' trial also indicated that Wirths' "cause" involved not paying the KDOR any money. The State admitted into evidence a recording of a phone call that Wirths made to a friend while in jail. During that phone call, Wirths told his friend that he was "going to push for *the cause*." (Emphasis added.) And Wirths told his friend, "I fought the law. I just had to make a decision that day to stand up and I knew this is what I had coming. But if I don't stand up, who will? I'm going to do a long time and I knew that. I knew that going in." During his testimony, Wirths confirmed that

13

"the cause" he referred to in the phone call meant his "right" not to pay retail taxes on materials he bought while doing construction projects for tax-exempt organizations.

It is a well-known rule that "a prosecutor may draw reasonable inferences from the evidence and is allowed considerable latitude in discussing the evidence." *State v. Corbett*, 281 Kan. 294, 312, 130 P.3d 1179 (2006). Here, Wirths argues that the prosecutor misstated evidence by telling the jury his "cause was to show you why he shouldn't have to pay taxes." But in making this argument, Wirths ignores that he testified that his "cause" was his right not to pay retail taxes on materials bought while working for tax-exempt organizations. Given Wirths' own testimony that his "cause" involved not paying taxes, the prosecutor did not misstate the evidence when telling the jury that Wirths' "cause was to show you why he shouldn't have to pay taxes."

Additionally, in making his argument, Wirths ignores that only his testimony supported his contention that the KDOR had wrongly sought tax payments from him. Indeed, even though Wirths referenced forms that established the KDOR wrongly sought tax payments on materials he bought while completing construction projects for tax-exempt organizations, Wirths did not admit those forms into evidence.

Also, during his cross-examination, Wirths admitted that the KDOR ultimately seized all of his construction company property. Clearly, the KDOR's ultimate seizure of Wirths' construction company property supports the evidence that Wirths actually owed retail taxes. In other words, the KDOR's ultimate seizure of Wirths' construction company property supports the evidence that the KDOR did not wrongly seek tax payments on materials Wirths bought while completing construction projects for tax-exempt organizations. And in turn, the evidence indicated that Wirths had avoided making tax payments that he rightly owed to the KDOR.

14

As a result, the prosecutor made a reasonable inference based on the evidence when he stated that Wirths' "cause was to show you why he shouldn't have to pay taxes, to show you what happened when you try to make him accountable." Thus, because the prosecutor made a reasonable inference based on the trial evidence when making the contested statement, the prosecutor did not commit error.

Finally, Wirths' argument that the prosecutor attempted to inflame the passions of the jury by talking about Wirths' "cause" is similarly unpersuasive. Wirths asserts that when the prosecutor discussed Wirths' "cause," the prosecutor wanted the jury to dislike him because he did not pay taxes. But Wirths' argument ignores that, before the prosecutor made the comment about Wirths' "cause," the prosecutor told the jury the following:

"First of all, his tax debt, and that tax debt—again, this isn't a situation where you should blame him for being behind on his taxes and not paying his taxes. We're not saying he's a bad guy because he didn't pay his taxes, and you're not going to find him guilty because he didn't pay his taxes."

Our Supreme Court has held that when reviewing a prosecutor's statement for error, an appellate court must consider the prosecutor's statement in the context of the prosecutor's closing arguments. See *State v. Cosby*, 293 Kan. 121, Syl. ¶ 5, 262 P.3d 285 (2011). Here, the prosecutor explicitly told the jury not to hold Wirths' tax problems against him when considering his guilt. Therefore, when we view the prosecutor's contested statements in context, it is readily apparent that the prosecutor did not want to inflame the jury's passions simply because Wirths did not pay taxes.

Also, it is clear that the prosecutor was not intending to inflame the jury with his "cause" comments. Indeed, Wirths used the word "cause" while talking to a friend about the incident. Wirths told the friend that he was "going to push for the cause." And he later

15

stated: "I fought the law. I just had to make a decision that day to stand up and I knew this is what I had coming. But if I don't stand up, who will?" On that basis, Wirths has failed to show that the prosecutor erred when he made statements about Wirths' "cause" during closing arguments.

*Premeditation*

Next, Wirths complains that the prosecutor erred when he told the jury during closing arguments that "if there's premeditation, anything more than that instantaneous thought, then you can find him guilty of attempted first degree murder." Wirths argues that in making this statement, the prosecutor misstated the law because he diminished the importance of premeditation as an element of attempted first-degree murder.

Wirths' argument hinges on our Supreme Court's decision in *State v. Moncla*, 262 Kan. 58, 72, 936 P.2d 727 (1997). There, the trial court instructed the jury that premeditation "'may arise in an instant.'" 262 Kan. at 72. But our Supreme Court held that "'may arise in an instant'" language was erroneous:

> "The use of such language in instructing a jury tends to diminish the importance of the element of premeditation. Nevertheless, the court's statement that premeditation means to have thought over the matter beforehand, and that there is no particular time period for premeditation, is a correct statement of Kansas law." 262 Kan. at 72.

In its brief, the State tries to distinguish the prosecutor's statement in this case from the language in the jury instruction at issue in *Moncla*. The State emphasizes that the *Moncla* jury instruction stated that premeditation "may arise in an instant" while the prosecutor stated that premeditation occurs with "anything more than that instantaneous thought." Thus, the State argues that Wirths' reliance on *Moncla* is misplaced because, unlike the jury instruction at issue in *Moncla*, the prosecutor did not state that

16

premeditation may arise in an instant. Instead, he stated that premeditation takes more than an instant because the prosecutor stated premeditation occurs when there is "more than that instantaneous thought."

Also, in making its arguments, the State also compares the prosecutor's comment to our Supreme Court's definition of premeditation in *State v. Thurber*, 308 Kan. 140, 169, 420 P.3d 389 (2018). There, our Supreme Court held that "'[a]lthough there is no specific time period required for premeditation, the concept of premeditation *requires more than* the instantaneous, intentional act of taking another's life.'" (Emphasis added.) According to the State, no prosecutorial error occurred here because the prosecutor's statement of premeditation mirrored our Supreme Court's definition of premeditation in *Thurber*.

Yet, the State's argument is unpersuasive. To be sure, the prosecutor's statement that premeditation may occur when "there's . . . anything more than that instantaneous thought" is distinguishable from the jury instruction at issue in *Moncla* because unlike the *Moncla* jury instruction, the prosecutor did not state that premeditation "may arise in an instant." Even so, the prosecutor's statement does not mirror our Supreme Court's definition of premeditation in *Thurber*. This is because the *Thurber* court held that premeditation *required more than* an instantaneous thought. And by stating that proof of premeditation requires more than an instantaneous thought, the *Thurber* court defined premeditation without creating a time requirement. The prosecutor's definition of premeditation, however, defined premeditation as having a particular time requirement because the prosecutor created a bright-line rule where "anything more than that instantaneous thought" constitutes premeditation.

Thus, during closing arguments, the prosecutor misstated the law by defining premeditation as having a particular time requirement. This contradicts our Supreme

Court's holdings in *Moncla* and *Thurber*. As a result, Wirths correctly argues that the prosecutor's statement diminished the importance of premeditation as an element.

Nevertheless, it is readily apparent that the prosecutor's misstatement of law was harmless beyond a reasonable doubt. Also, although the State wrongly argued that the prosecutor's definition of premeditation mirrored our Supreme Court's definition of premeditation in *Thurber*, the *Thurber* decision is instructive in our harmlessness error discussion. In *Thurber*, our Supreme Court determined that the prosecutor's statement during closing arguments that premeditation "[c]an be instantaneous" was harmless beyond a reasonable doubt (1) because the prosecutor misstated the law only once and (2) because "considerable evidence supported that Thurber acted with premeditation." 308 Kan. at 169, 171.

Similarly, in this case, the prosecutor misstated the law on premeditation only once. And perhaps more significantly, the trial court instructed the jury on the correct definition of premeditation. Thus, the harm stemming from the prosecutor's errant definition of premeditation was lessened (1) by the fact the prosecutor misstated the law only once, and (2) by the trial court's legally correct definition of premeditation in the jury instruction.

Additionally, as in *Thurber*, strong evidence of premeditation existed in Wirths' case. To review, at Wirths' trial, Robertson testified that after the KDOR seized Wirths' truck but before Wirths shot Holloway, Wirths came home and rummaged around for something. The State alleged that Robertson overheard Wirths rummaging for a gun. Thus, the evidence indicated that after Wirths learned about the bank levy, he went home to retrieve his handgun before going to the KDOR office. Next, the crime scene investigator testified about finding the black portfolio's packaging inside the otherwise clean bed of Wirths' parents' pickup truck. And although Robertson testified that Wirths always carried his handgun in his black portfolio, on cross-examination, she admitted that

18

she initially told police that she did not know that Wirths owned a handgun. Thus, the evidence indicated that it was not normal for Wirths to carry a handgun in a black portfolio. Indeed, the evidence indicated that Wirths bought a black portfolio shortly before going to the KDOR office so he could sneak the handgun into the building.

Also, Wirths acknowledged to a friend that he knew what he was about to do would affect his freedom: "I fought the law. I just had to make a decision that day to stand up and I knew this is what I had coming. But if I don't stand up, who will? I'm going to do a long time and I knew that. I knew that going in." Clearly, this shows Wirths' forethought or premeditation before shooting Holloway.

Finally, it is worth mentioning that the State's case against Wirths did not hinge on Wirths forming premeditation instantaneously. That is, as developed in the prosecutor's closing argument, the State argued that Wirths planned his crime during the time between learning about the bank levy and showing up at the KDOR office. The State emphasized Wirths' decision to retrieve his handgun from his home and buy the black portfolio in arguing the existence of premeditation. So, whether Wirths formed the premeditation necessary to commit attempted first-degree murder instantaneously was not something the prosecutor advocated at Wirths' trial. Therefore, whether Wirths formed the premeditation necessary to commit attempted first-degree murder instantaneously was not an issue before the jury.

In summary, although the prosecutor misstated the law on premeditation, this error did not affect the jury's verdict because the prosecutor misstated the law only once, the trial court correctly instructed the jury on premeditation's definition, significant evidence supported that Wirths acted with premeditation, and the theory of the State's case did not hinge on Wirths shooting Holloway on a whim. As a result, we determine that the prosecutor's misstatement of law to be harmless beyond a reasonable doubt.

19

*Wirths' Credibility*

Next, Wirths' third and fourth prosecutorial error arguments both involve the prosecutor's statements on his credibility. Wirths argues that the prosecutor wrongly commented on the veracity of his testimony when the prosecutor made the following statements:

(1) "[Wirths] comes in yesterday and he says [during his testimony], 'Well, I didn't intend to kill, and I certainly didn't do it with premeditation. I just snapped.' I'm not sure what you would expect coming in, if you would expect a person to get on the stand and fully confess and admit to their sins and say, yes, I did this with premeditation and intent. If you expected that, sorry. Most people don't come in and just do that on the stand. If they did that, they'd just come in and say, okay, I'm guilty"; and

(2) "If [Wirths is] just there to confront him and just there to negotiate, why take the gun? He doesn't answer that. He can't answer that because sometimes the truth is too hard sometimes."

In making his argument, Wirths points to precedent prohibiting the prosecutor from commenting on a defendant's credibility. Indeed, our Supreme Court has long held that "'[a] prosecutor is . . . forbidden from accusing a defendant of lying. '" *State v. Haygood*, 308 Kan. 1387, 1402, 430 P.3d 11 (2018) (quoting *State v. Fisher*, 304 Kan. 242, 253, 373 P.3d 781 [2016]). Furthermore, this ban extends to other language indicating that the defendant is not telling the truth. For instance, our Supreme Court has held that a prosecutor erred when calling the defendant's testimony a "fabrication" and a "yarn." *State v. Elnicki,* 279 Kan. 47, 62, 105 P.3d 1222 (2005). It was also error for a prosecutor to say that the defendant's testimony was "not credible" and to ask the jurors whether they could "buy" the defendant's testimony. *State v. Akins*, 298 Kan. 592, 607, 315 P.3d 868 (2014).

20

Even so, the ban on discussing the defendant's credibility does not bar a prosecutor from pointing out inconsistencies in the defendant's testimony or from arguing that the evidence "reflects poorly on [the] defendant's credibility." *Akins*, 298 Kan. at 608. Thus, our Supreme Court has held that although "the ultimate conclusion as to any witness' veracity rests solely with the jury," "[w]hen a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable." *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000). Additionally, whether the prosecutor's statement was reasonable often hinges on the context of the prosecutor's statement. *Haygood*, 308 Kan. at 1402.

In its brief, the State relies on the preceding precedent. It contends that the prosecutor in this case did not err because his statements "were designed to aid the jury with reconciling the evidence of premeditation with the defendant's assertion that his conduct was not calculated but was attributable to a snap from reality." The State also contends that the prosecutor never made "a general statement regarding [Wirths'] credibility or general trustworthiness."

Nevertheless, the prosecutor overreached when he stated that most defendants do not confess on the witness stand. The prosecutor here was not reconciling conflicting evidence. Instead, the prosecutor made a generalized statement about defendants who testify not admitting their guilt on the stand. Additionally, when stating that Wirths could not explain why he took his handgun to the KDOR office because "sometimes the truth is too hard," the prosecutor did reference conflicting evidence. But in referencing the conflicting evidence, the prosecutor also made a conclusory statement about Wirths' credibility when he explicitly stated that the "truth [was] too hard" for Wirths to face.

Thus, although the prosecutor never expressly used the word "lie," he insinuated to the jury that Wirths was not telling the truth. And thus, the prosecutor offered a personal opinion about Wirths' credibility. As a result, the prosecutor erred, violating our Supreme

21

Court precedent banning prosecutors from making conclusions about a defendant's credibility. See *Haygood*, 308 Kan. at 1402.

In any event, the prosecutor's statements were not so egregious as to require reversal of Wirths' attempted first-degree murder conviction. The State argues that we can find the prosecutor's comments harmless beyond a reasonable doubt when considering the context of the prosecutor's statements. The State also points to the evidence against Wirths, arguing that the evidence was so overwhelming that the prosecutor's comments did not affect the jury's verdict.

We draw guidance from our Supreme Court decision in *State v. Pribble*, 304 Kan. 824, 834, 375 P.3d 966 (2016). There, the State charged Pribble with numerous drug charges. At his jury trial, Pribble testified in his own defense. During closing arguments, the prosecutor stated that Pribble's testimony was unbelievable. Our Supreme Court determined that the prosecutor's statement improperly commented on Pribble's credibility. 304 Kan. at 834. Even so, our Supreme Court did not reverse Pribble's conviction. In reaching this decision, our Supreme Court determined that the prosecutor's other comments about credibility during closing arguments as well as the weight of the evidence against Pribble showed that the prosecutor's errant comments did not affect the jury's verdict:

> "[W]e note that the prosecutor sent a mixed message, rather than just the wrong message. Before proffering his personal opinion, the prosecutor specifically told the jurors that it was their duty to determine the weight and credibility to be given to the testimony of each witness. Moreover, one would not expect the jurors to have been surprised to learn that the prosecutor did not believe the defendant's exculpatory statements, given that the prosecutor was continuing to seek defendant's conviction.
> ". . . [T]he evidence of Pribble's guilt was circumstantial in nature but substantial in quantity. The jurors heard testimony from law enforcement officers regarding the marijuana, packaging materials, labels, bongs, blow torches, methamphetamine, and a

possible grow room found in Pribble's home. They saw photographs meticulously documenting the search as well as the large quantity of evidence seized." 304 Kan. at 836.

Of note, our Supreme Court decided *Pribble* a few months before reforming the prosecutorial error test in *Sherman*. So, in *Pribble*, our Supreme Court used the prosecutorial misconduct test, which is now reserved for prosecutorial acts that exceed mere negligence. See *Sherman*, 305 Kan. at 104, 109. Still, our Supreme Court's decision in *Pribble* is highly persuasive authority because the decision supports that a prosecutor's improper comment on a defendant's credibility may be harmless (1) if the prosecutor otherwise made correct statements about credibility determinations and (2) if significant evidence supports the defendant's conviction. 304 Kan. at 836.

The error here is comparable to the error at issue in Pribble's case. As in *Pribble*, the prosecutor sent a mixed message about credibility determinations by making the errant comments on Wirths' credibility but by also telling the jurors that they determined witnesses' credibility. Indeed, immediately after the prosecutor stated that most defendants do not "get on the stand and fully confess and admit their sins and say, yes, I did this with premeditation and intent," the prosecutor told the jury the following:

> "He's here for a trial. So he comes in with his version of events, one that you have to consider. And when you do that, the Judge has told you, it's for you to determine the weight and credit to give to people's testimony. You get to judge his credibility just the same as you did everyone else's."

And later during closing arguments, the prosecutor also told the jury that when considering Wirths' testimony about owning the black portfolio since Christmas 2016, the jury would "get to examine [that evidence] and decide if that [evidence] seem[ed] credible . . . . [since] it's nearly brand new . . . like somebody just bought it."

23

Another reason like in *Pribble*, substantial evidence supported Wirths' attempted first-degree murder conviction. As addressed in the preceding section on the prosecutor's premeditation misstatement, substantial evidence indicated that Wirths shot Holloway with premeditation. Also, even if we ignored the contested evidence regarding Wirths' premeditation, it is undisputed that he purposefully brought a concealed handgun into the KDOR office while confronting Holloway about the bank levy. This fact alone is strong evidence of Wirths' intent.

So, we hold that the prosecutor's errant comments on Wirths' credibility were harmless beyond a reasonable doubt for the same reasons our Supreme Court held that the prosecutor's errant comments on Pribble's credibility were harmless beyond a reasonable doubt. As a result, we reject Wirths' argument that prosecutorial error entitles him to a new trial and affirm his attempted first-degree murder conviction.

*May the State Move the Trial Court to Impose an Upward Durational Departure Sentence Should Wirths be Convicted of a Crime Upon Retrial?*

Finally, in its cross-appeal, the State argues that if we reverse and remand Wirths' case for a new trial, it should be allowed to move the trial court to impose an upward durational departure sentence again if he is reconvicted. Nevertheless, we determine that this argument is unpersuasive.

Because we have affirmed Wirths' attempted first-degree murder conviction, it is unnecessary for us to consider this argument. Also, the argument is moot. See *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012) (holding that the court does not decide moot issues or render advisory opinions).

Affirmed.

24