IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,349

STATE OF KANSAS,
*Appellee*,

v.

WILLIE E. PARKER,
*Appellant*.

SYLLABUS BY THE COURT

1.

Statements made during a custodial interrogation must be excluded under the Fifth Amendment to the United States Constitution unless the State demonstrates it used procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination.

2.

The voluntariness of a defendant's *Miranda* rights waiver can be implied under the circumstances. Certain factors may contribute to a finding of voluntariness, such as the defendant explicitly saying that he or she understood his or her rights and then proceeding to answer questions.

3.

There is no requirement that *Miranda* rights be read aloud in order to obtain a legally sufficient waiver of the right to remain silent.

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed March 13, 2020. Affirmed.

1

*Meryl Carver-Allmond,* of Kansas Capital Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Daniel G. Obermeier*, assistant district attorney, argued the cause, and *David Greenwald*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.:  Willie Parker takes this direct appeal to the Kansas Supreme Court from his conviction of one count of premeditated first-degree murder. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Willie Parker was employed as a driver for First Class Medical Transportation, a delivery company that takes patients to and from the Kansas City Transitional Care Center, which is across the street from the University of Kansas Medical Center. Michel Ziade was his employer. On July 28, 2015, Parker and a coworker delivered a patient around noon and then returned to a parking garage where their van was located. Parker and Ziade got into a verbal altercation in which Parker complained about his working hours and having to work night shifts.

Ziade accused Parker of being late picking up a passenger, and the two exchanged insults and profanity. At one point, Parker said, "You can't fucking tell me what to do." The argument devolved into a fist fight. Witnesses reported that Ziade was bent over while Parker repeatedly hit him in the face. The witnesses did not see Ziade hit or strike Parker. Another employee, Stanley Burleson, pulled them apart and stood between them, and Ziade asked the bystanders to call the police.

Parker then went to his van, opened the door, and stood for a short time retrieving something. After about 60 seconds, Ziade went into the parking garage and walked over to his car. He was about to get in when Parker came after him, wielding a pistol. Ziade turned and walked quickly or ran from the parking garage. Parker pursued Ziade at a fast walking pace, brandishing a gun, and shot at Ziade several times. After the first shot, Ziade ran out of the underground parking garage. Parker followed him and fired four more shots. Ziade fell to the sidewalk and rolled over on his back. Parker walked up to him and shot him one more time before turning and walking back into the parking garage. He went to his van, grabbed a bag, and then walked away down an alley.

Although he was taken to the hospital almost immediately, Ziade died within minutes of the shooting. He died from a bullet that had been fired into his back and penetrated his heart.

On July 31, 2015, based on the statements of eyewitnesses and a search of Parker's home, the State filed an Information charging Parker with premeditated first-degree murder. On August 6, 2015, investigators located Parker in a church building where he barricaded himself for some six hours before tear gas forced him to surrender into custody. Within about an hour, detectives began a lengthy interrogation, in which Parker admitted killing Ziade.

Parker was sent to Larned State Hospital for a competency evaluation, which disclosed that, despite signs of possible mental illness, he was competent to communicate with counsel and to be tried. Parker nevertheless was uncooperative, refusing to speak with at least one of his appointed counsel.

The case went to trial in June 2017, and Parker presented no witnesses in his defense. The court instructed the jury on premeditated first-degree murder and on the

3

lesser included offense of second-degree murder. The jury found Parker guilty of first-degree murder. He took a timely appeal to this court.

ANALYSIS

*Motion to Suppress*

Parker made several self-incriminating statements during the interrogation that took place immediately after his arrest. Before his trial, Parker moved to suppress these statements. The district court denied that motion. Parker argues on appeal that the district court should have suppressed his statements because the investigators did not take sufficient steps to ensure that he understood his *Miranda* rights. We conclude that, despite the unusual manner in which Parker received an explanation of his rights—necessitated by his refusal to allow the detectives to explain the rights out loud—no reversible error occurred.

A dual standard is used when reviewing a decision ruling on a motion to suppress a confession. We review the factual underpinnings of a district court's ruling under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. We will not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Dern*, 303 Kan. 384, 392, 362 P.3d 566 (2015).

The voluntariness of a waiver of a defendant's *Miranda* rights is a question of law that an appellate court determines de novo based on the totality of the circumstances. *State v. Kirtdoll*, 281 Kan. 1138, 1144, 136 P.3d 417 (2006).

Statements made during a custodial interrogation must be excluded under the Fifth Amendment to the United States Constitution unless the State demonstrates it used

4

procedural safeguards, i.e., *Miranda* warnings, to secure the defendant's privilege against self-incrimination. These safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation. *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018). On appeal, the appellate court assesses whether a *Miranda* waiver was knowing, voluntary, and intelligent under a totality of the circumstances test. *State v. Mattox*, 305 Kan. 1015, 1042, 390 P.3d 514 (2017).

The voluntariness of a defendant's *Miranda* rights waiver can be implied under the circumstances. *Kirtdoll*, 281 Kan. 1138, Syl. ¶ 1. Certain factors may contribute to a finding of voluntariness, such as the defendant explicitly saying that he or she understood his or her rights and then proceeding to answer questions. 281 Kan. at 1146-47; see also *State v. Wilson*, 215 Kan. 28, 30, 523 P.2d 337 (1974) (when defendant says he or she understands his or her rights and makes no showing that statements were coerced or in some other way involuntary, *Miranda* safeguards are satisfied).

There is no requirement that *Miranda* rights be read aloud in order to obtain a legally sufficient waiver of the right to remain silent. See, e.g., *United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994), *cert. denied* 514 U.S. 1121 (1995); *United States v. Bailey*, 468 F.2d 652 (5th Cir. 1972); *United States v. Alexander*, 441 F.2d 403, 404 (3d Cir. 1971); *United States v. Van Dusen*, 431 F.2d 1278 (1st Cir. 1970); *State v. Olquin*, 216 Ariz. 250, 252-53, 165 P.3d 228 (Ct. App. 2007), *review denied* (2008); *Wise v. Commonwealth*, 422 S.W.3d 262, 271 n.4 (Ky. 2013); *State v. A.M.*, 237 N.J. 384, 400, 205 A.3d 213 (2019); *People v. Warren*, 2 A.D.3d 1317, 1318, 770 N.Y.S.2d 266 (2003), *leave to appeal denied* 1 N.Y.3d 636 (2004); *State v. Strobel*, 164 N.C. App. 310, 313-14, 596 S.E.2d 249 (2004), *cert. denied* 545 U.S. 1140 (2005).

There is also no requirement that interrogators follow a specific protocol for determining whether questioned individuals understand their rights. To be sure, interrogators may not wait until questioning is underway to administer *Miranda* warnings

and then rely on statements made before they gave the warnings. See, e.g., *Missouri v. Seibert*, 542 U.S. 600, 617, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (when investigators intentionally employ two-step interrogation strategy, postwarning statements related to substance of prewarning statements must be excluded unless curative measures taken before postwarning statement is made).

Here, however, the detectives provided Parker with a written statement of his rights along with an offer to read them out loud, and he read the statement of rights, all before the substantive interrogation began. Although the better practice is that interrogators read the *Miranda* summary of rights out loud and make follow-up inquiries about whether the person being questioned understands those rights, that protocol was not possible in this case, because Parker insisted that an oral explanation of the rights was condescending behavior that he would not tolerate. In this unusual situation, we must look to the circumstances and the words used by both the detectives and Parker in order to determine whether he understandingly waived his rights against self-incrimination.

*State v. Davis*, 306 Kan. 400, 417, 394 P.3d 817 (2017), sets out a nonexclusive list of factors to be examined in evaluating whether a confession was voluntary. The factors are:

> "'(1) the accused's mental condition; (2) the duration and manner of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. [Citations omitted.]'"

Before denying Parker's motion to suppress, the district court went through these factors in order, resolving them in favor of the State:

6

"The court resolves factor number one, the issue of competency, in favor of the State. Parker seems to be competent. He did not appear to be suffering from any type of delusions about why he was there. As previously indicated he did not seem to be under lingering effects of any chemical agents, he seemed to understand the reason for the interview and there was no violation as far as number one is concerned. As to factor number two the court is directed to consider the duration and manner of the interrogation. The interrogation lasted one hour 49 minutes and 45 seconds. At no time were the detectives in any way threatening Parker. Only Parker and the two detectives were present. The detectives were not armed. Parker was not restrained in any way. There were no handcuffs or leg shackles. Parker was of course confined in the interview room with the detectives but the court finds nothing amiss with the confinement. As to factor number three, the ability of the accused to request to communicate with the outside world, Parker made no request to communicate with the outside world. The detectives made it clear during the statement that he had a right to consult with an attorney if he chose to do so. He did not make that request. As to factor number four, the accused's age intellect and background, detective Sutton testified that Parker was 40 years of age, that he appeared to be well educated and fluent. Parker's background was not really discussed but it did not appear from a review of the video that anything about his age, his intellect or his background would have affected his ability to give a voluntary statement. The fifth factor is the fairness of the officers in conducting the interrogation. The interrogation was a very conversational event. No threats were made, no shouting and no aggressive movements by either of the detectives. They remained seated and calm throughout the interview. The court finds nothing that would have affected fairness of the investigation based upon the interrogation or based upon the officers' behavior. The defendant seemed to speak and understand English without any problem. The court must make its determination of admissibility of defendant's statement based on the totality of the circumstances. The prosecution has born its burden of proving Parker's confession is admissible by a preponderance of the evidence, See *State v. Gilliland*, 294 Kansas 519, 528-529, 276 P.3d 165 (2012), and viewing the totality of the circumstances surrounding the statement believes it was freely and voluntarily given."

Parker insists that the officers did not do enough to ensure he understood his rights. He points to several areas of concern—his troubled mental state, the recent standoff with police and exposure to tear gas, and an asserted inability to communicate

with anyone outside the interrogation. Parker centers his argument for reversal on the asserted failure of the investigators to make sure that he understood his rights:

"Because the police in this case did nothing to ensure that Mr. Parker—a defendant who they had been informed was mentally ill and who had freshly been sprayed with tear gas at the end of a long standoff—understood the *Miranda* warnings on the sheet of paper handed to him, his purported waiver of his rights was invalid."

Our review leads us to the conclusion that substantial competent evidence supported the district court's factual findings and that those findings showed a voluntary waiver of *Miranda* rights.

The topic of Parker's rights came up a couple of times during the interrogation. After a few preliminary discussions of what he wanted to drink, Detective Sutton said: "We'll be able to sit down and have a good conversation, but I do have to read you your *Miranda* Rights, okay?" The following dialogue then took place:

"[Parker:]  I will not be signing any—
"[Detective Jason Sutton:]  Okay.
"[Parker:]  —documents.
"[Sutton:]  That's okay.
"[Parker:]  . . . From here on out.
"[Sutton:]  That's, that's understandable. I, I hear ya.
"[Parker:]  Uh . . . if you wish me to read it, I will, you don't have to read it to me.
"[Sutton:]  That's the laws that it says I have to read it.
"[Parker:]  Uh-uh, I didn't need it, but I will read it.
"[Sutton:]  Yeah, if you wanna read it and y— and you understand that, and then that's great, too.
"[Parker:]  Well, it—
"[Detective Anthony Sanchez:]  Do you wanna read it out loud then?
"[Parker:]  No, I don't, I don't need no one to, to read it for me, I don't need to read it out loud.

"[Sutton:]  Okay. You wanna read it?

"[Parker:]  Ye—yeah.

"[Sutton:]  Yeah, we, uh, we started workin' on that case, and, and it became obvious to us that there was two sides to this, because the video wasn't telling everything, and that's one thing, you know, like, we'd talk to ya, Mr. Parker, is we'd like to hear more about what you've been talkin' about in your own words, in your own way. You know, if you're in a position where you wanna do that with us, then we appreciate that. If you're in a position where you don't want an, an attorney with you, then we agree to that with you and we understand that, and we can sit here and, and discuss whatever you wanna discuss about how that day went, the parts you wanna talk about and the parts you don't wanna talk about, and like you said, it, there was a certain level of an agreement between you and Mr. Ziade, and, and, obviously, he broke that, that, uh, level of, of trust and, and agreement between you two, somethin' a man shouldn't do, m'kay? So if all that's okay with you, then, uh, we would like to hear more about, um, your thoughts on this."

Parker looked at the statement of *Miranda* rights for 62 seconds and then put the form down. He refused to initial or sign the statement. He then proceeded to answer (or refuse to answer) questions about the shooting. Much later in the interrogation, the subject of *Miranda* rights came up again.

"[Sanchez:]  Okay. Okay, when we said that we're gonna say the rights to you, you got upset. I mean, is there a reason why you didn't want us readin' the rights to you? Uh, we understand you can read, you're an educated man, we know that, especially with the, you know, readin' the dictionary, thesaurus, all that.

"[Parker:]  Who told you I read the dictionary?

"[Sanchez:]  I'm sayin' we, we interviewed several people.

"[Sutton:] I seen two dictionaries in your house.

. . . .

"[Sanchez:]  [T]hat's the reason why we wanted to know about the *Miranda*, because we understand you can read and you understand that you know that, but you got upset because you didn't want him readin' 'em or me readin' 'em to you.

"[Parker:]  What, one, I said I wasn't goin' sign anything.

"[Sanchez:]  No, we un—we respect that.

9

"[Parker:] Two, yes, it did make me upset, because I don't need no one treatin' me like a child, and that's exactly what they did.

"[Sanchez:] Who did?

"[Sutton:] First Class? [Parker's employer.]

"[Sanchez:] Yeah, but we, we understand you're not a child, you're a man.

"[Parker:] Doesn't matter what they, uh, you understand.

"[Sanchez:] You know, the whole thing is we're just tryin' to see who you are. So, like I said, you refused to sign it, but you understood your rights?

"[Parker:] I understand everything I read."

First, we note that the refusal to sign a rights waiver form is not tantamount to a desire not to be questioned. Subsequent voluntary responses to inquiries after an initial *Miranda* warning can create an effective waiver. *State v. Boyle*, 207 Kan. 833, 841, 486 P.2d 849 (1971).

Second, we acknowledge that there were signs of mental illness but conclude that substantial competent evidence supports the district court's findings with regard to Parker's competence, Parker's ability to contact the outside world, and the fairness of the officers in conducting the investigation. We further conclude that the findings show Parker's waiver was voluntary.

Going into the interrogation, Detective Sutton spoke with people who knew Parker. They told him that Parker was eccentric: he would read the dictionary, he drank large quantities of vinegar, and he had said he thought he was God. These topics came up obliquely during the interrogation, with Parker responding with some annoyance that he wished people would not talk about him outside his presence.

Ultimately, however, Parker has not directed us to anything that shows his mental condition rendered him unable to voluntarily waive his rights or the officers' conduct unfair. In fact, Parker does *not* argue that he actually did not understand his rights. He

10

only asserts that the police should have done more to ensure that he understood. This is a subtle yet important distinction. Parker points to nothing in the record that suggests that he did not understand his rights or the interrogation process. In fact, toward the end of the interrogation, Parker stated that he understood what he read.

Although he was not always responsive and he was often argumentative, Parker displayed a clear understanding of what was going on and the roles of the detectives. For example, he sometimes responded to questions by turning them back around and challenging the detectives in a somewhat humorous fashion to figure out what had happened. When they asked how he had managed to leave the crime scene so quickly, he laughed and said, "That's somethin' you goin' have to find out." Later on, after the interrogators speculated how he might have gotten away, he said, "Well, y'all the detectives."

His statements indicated that he understood that he did not have to provide affirmative answers to questions from the police. When the detectives asked him why he finally surrendered to police and suggested he was hoping they would shoot him, he responded, "I don't know anything about all that. . . . You tryin' to get me to say somethin' that I don't have no ideal [*sic*] about." He also clearly understood the general nature of the charge against him: when an interrogator asked him if he knew what he was charged with, Parker responded, "Prolly chargin' me with first degree murder."

The overall tenor of the interrogation showed a defendant who knew what crime he had committed and how he had done it; who understood that the police were trying to obtain incriminating statements from him; who was playing a cat-and-mouse game with the interrogators; and who understood his rights and how the interrogation process worked.

11

*Collins*, 40 F.3d 95, presented a situation remarkably similar to what we address here. The Fifth Circuit wrote:

"It is axiomatic that an accused must be informed of his *Miranda* rights in a way that ensures his knowing, intelligent, and voluntary exercise or waiver thereof. The record supports the district court's finding that Collins was effectively informed of his rights. Collins perused the form for a minute before returning it to the agents with the words 'I ain't signing that.' One agent testified that Collins appeared to read and understand the form. We perceive no error in the district court's crediting of this testimony and determining that Collins was informed of and understood his rights considering his age—38, his education—GED degree, and his familiarity with the criminal justice system as a consequence of his extensive criminal history.

"Whether Collins waived his *Miranda* rights presented a factual question for the district court. Such waivers may be direct or, in some instances, they may 'be clearly inferred from the actions and words of the person interrogated.' The mere answering of questions is insufficient to show waiver; however, there must be some affirmative action demonstrating a waiver of Collins' *Miranda* rights. We find such action to be present herein.

"The record reflects that after Collins refused to sign the form one of the agents told him, 'You know, you can talk to us if you want. You don't have to. You read the form. But if you want to talk to us, you can.' At that point Collins replied 'Okay.' Thereafter, upon being questioned about the Dallas robberies he confessed. In this setting, the trial court did not err in finding that Collins waived his *Miranda* rights. The confession was properly admitted." 40 F.3d at 98-99.

Like the Fifth Circuit in *Collins*, we conclude that the district court here made no error when it admitted the interrogation statements.

*Jury Instruction*

Before trial, Parker requested a voluntary manslaughter committed upon a sudden quarrel or in the heat of passion instruction. The district court denied the request and

12

instructed the jury on premeditated first-degree murder and intentional second-degree murder. Parker asserts that the voluntary manslaughter instruction was justified and that reversal is required.

The analytic steps for reviewing the denial of a requested jury instruction are as follows:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011).'" *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

Parker preserved this instruction issue, presenting the proposed voluntary manslaughter instruction to the district court and arguing that the testimony of some witnesses supported it. The instruction would have been legally appropriate because voluntary manslaughter is a lesser included offense of first-degree murder. See *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008).

The question, then, is whether the instruction would have been factually appropriate. Voluntary manslaughter is "knowingly killing a human being committed: (1) Upon a sudden quarrel or in the heat of passion; or (2) upon an unreasonable but honest belief that circumstances existed that justified use of deadly force . . . ." K.S.A. 2018 Supp. 21-5404(a). The core elements of voluntary manslaughter are an intentional killing and legally sufficient provocation. *State v. Campbell*, 308 Kan. 763, 775, 423 P.3d 539 (2018).

13

Although the statute does not define "sudden quarrel" or "heat of passion," we have defined "heat of passion" as "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror', based 'on impulse without reflection.'" *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014). The provocation must be "'sufficient to cause an ordinary man to lose control of his actions and his reason.'" 299 Kan. at 864.

"Sudden" means "'[h]appening without warning; unforeseen[;] [c]haracterized by hastiness; abrupt; rash[;] [c]haracterized by rapidity; quick; swift.'" And "quarrel" means "'[a]n altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons.'" *State v. Bernhardt*, 304 Kan. 460, 476, 372 P.3d 1161 (2016). "Mere words or gestures, however offensive, do not constitute legally sufficient provocation." *Hayes*, 299 Kan. at 866.

In the present case, the surveillance cameras showed and the eyewitnesses testified that, after Burleson got between Parker and Ziade, Parker took about a minute to walk back to his van, retrieve a handgun, and walk quickly in pursuit of Ziade, firing as he pursued him.

In *Campbell*, this court held that the conduct was neither abrupt nor unforeseen when the defendant left a house, took the time to cock his gun, and returned to the house, whereupon he shot the victim. Under those facts, this court held that the conduct "reveal[ed] a level of calculation" that belied heat of passion or loss of control. 308 Kan. at 776. We cited to *Hayes*, which in turn cited to *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 (2012), holding that a defendant's "calculated conduct" undercut a claim that the action was taken "upon impulse without reflection," thus rendering a heat-of-passion instruction inappropriate. 308 Kan. at 776.

14

Here, Parker took approximately 60 seconds to go from his van to the underground garage and shoot Ziade. There was no active confrontation at the time; Ziade was walking away from him.

Parker urges this court to find sufficient evidence in the record to demonstrate a heated quarrel that would support a voluntary manslaughter instruction. There is indeed evidence of an argument in which both men used strong language in an accusing manner, and there is even some evidence (not supported by other witnesses or the surveillance recordings) that Ziade may have struck back against Parker. But the evidence is substantial and uncontested that, following the argument, Parker walked back to his van, spent some time retrieving a gun from a duffel bag, walked back to Ziade, and shot him in the back as he attempted to get away. In his interrogation, Parker did not say that he lost control of his ability to make decisions; he instead stated that he went for his gun because he had been unable to kill Ziade with his fists and he wanted to finish the undertaking. There is so little evidence of heat of passion at the time of the shooting and so much evidence of calculated decision-making that, in line with *Campbell* and *Wade*, the voluntary manslaughter instruction was not factually appropriate. We find no error in the district court's rejection of the requested instruction.

The district court is affirmed.

PATRICK D. MCANANY, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge McAnany was appointed to hear case No. 118,349 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.