NOT DESIGNATED FOR PUBLICATION

No. 121,038

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

STEPHANIE ROSE RUMOLD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed August 14, 2020. Affirmed.

*Heather Cessna* and *Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Laura L. Miser*, assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., GARDNER, J., and WALKER, S.J.

PER CURIAM:  After Stephanie Rose Rumold waived her right to a jury trial, the district court found her guilty in 2018 of burglary of a dwelling and misdemeanor theft. Because of her prior convictions for aggravated burglary and conspiracy to commit aggravated robbery, the district court scored Rumold's criminal history score as a B and sentenced her to 29 months in prison.

On appeal, Rumold first challenges the voluntariness of her *Miranda* waiver. Yet under a totality of the circumstances test, we affirm the district court's denial of Rumold's

1

suppression motion. Next, Rumold argues her sentence was illegal because the district court should have classified her Kansas 2010 aggravated burglary conviction as a nonperson felony because that crime is broader than the Kansas 2018 aggravated burglary statute. We disagree, finding the identical-or-narrower rule inapplicable. Finally, Rumold contends the Kansas Sentencing Guidelines Act's (KSGA) criminal history scheme is unconstitutional under section 5 of the Kansas Constitution Bill of Rights. But Rumold fails to show that the protections of section 5 are broader than its federal counterpart and that a common-law rule existed at the time of adopting the Kansas Constitution that would preclude the KSGA's scheme.

*Factual and Procedural Background*

The State charged Rumold with burglary of a dwelling and misdemeanor theft, committed August 25, 2018. Before trial, Rumold moved to suppress incriminating statements. Rumold admitted to the arresting officers that she had been inside the burglarized residence and had taken personal property. But she complained to the district court that the officers coerced those statements and obtained them without a valid *Miranda* warning.

The district court held a hearing on the motion. Officer Nathan Rankin was the sole witness, and he presented the video from his body camera. After responding to a report of a burglary, Rankin and his fellow officers believed that a suspect was hiding nearby in a grouping of trees. That suspect turn out to be Rumold. The body camera video showed Rankin and another officer, tasers drawn, yelling at Rumold to come out from the trees and lie on the ground. When she did, several officers helped handcuff her arms behind her back. The other officers then left Rankin alone with Rumold while they searched the trees. Rankin testified that this initial interaction was intense, but the situation deescalated once they secured Rumold.

2

While Rumold sat on the ground, Rankin asked her to identify herself. She replied her name was "Stephanie Gomez," her birthday was December 1, 1991, and she did not have identification. Rankin later learned that neither that name nor that birthdate was correct.

The video shows that when Rankin asked Rumold to stand, she told him that she was not trying to resist them but was only scared. Rankin reproached her for entering others' houses and, while walking, recited her *Miranda* rights. Rankin asked Rumold if she understood these rights, but she did not respond, so Rankin asked again. The body camera's audio did not pick up Rumold's response. But Rankin testified that she responded, "yeah," and he believed she understood her rights. And the video records Rankin reciting Rumold's *Miranda* rights to her. Similarly, Rankin's affidavit says, "I read Stephanie her Miranda rights at approximately 1206 hours. Stephanie advised she understood her rights and waived her right to have coun[sel] present."

The video then shows Sergeant Dragonas approach and ask if Rumold had agreed to talk. Rankin responded, "Yeah, she's talking." Dragonas questioned Rumold about her part in the burglary and about her accomplice. Rumold admitted to being in the house and taking paperwork and postcards. She also discussed with Dragonas what cooperation would mean for her.

An ambulance took Rumold to the hospital to treat her ankle injury. At the hospital, Rumold gave Rankin more information about the burglary. During closing arguments, the State conceded that if the initial *Miranda* warning were insufficient or Rumold's statements at the scene were involuntary, then Rankin's questioning at the hospital would also be inadmissible.

The district court denied Rumold's motion to suppress. It found that after the initial contact, the situation quickly deescalated, and the police were not overly aggressive when they handcuffed her. It stated also:

"I think it's important to note that after she was cuffed they did ask some quick questions, her name. She had the wherewithal at that time to, as [the State] pointed out, give a false name. So that indicates to the Court that she wasn't so overcome by the high intensity situation or the stress of the situation that she wasn't thinking. She may not have been making good decisions, because it's never a good idea to lie to law enforcement, but she was working out a strategy of how she was going to deal with this situation.

"Shortly after she was handcuffed, she was read her *Miranda* warnings. Although the video—or audio on the recording did not pick it up, the officer testified unequivocally that she responded she understood her *Miranda* warnings. That testimony is not controverted, other than by argument. There is no evidence to the contrary before the Court.

"Counsel for the defendant argues a single alleged 'yeah' is not sufficient to show an understanding of the *Miranda* warnings. The Court is convinced that a single alleged 'yeah,' whether recorded or not, coupled with the obvious cooperation of the individual making sure officers knew that she was interested in getting some benefit from her cooperation, show that she knew what her *Miranda* rights were and, in this Court's mind, effectively waived that right by cooperating.

. . . .

"I've heard no evidence here today that would cause me any reason to believe that Ms. Rumold had problems understanding any of the questions. There's nothing to indicate that she did not understand she had the right to refuse to answer any questions.

"The Court finds the State has met its burden of proof in this case. The statements made by Ms. Rumold, while they were made in custody, they were voluntarily given after *Miranda* warnings. The motion to suppress is denied."

4

After the motion hearing, Rumold waived her right to a jury trial and agreed to submit the case to the judge on stipulated facts. Those facts included Rumold's admissions to the police:

> "4. Defendant was questioned by law enforcement, and she admitted to having been inside the residence at 1028 Woodland Street; furthermore, she admitted to taking miscellaneous items of personal property from said residence."

The stipulations also included that a reporting party believed Rumold was the person he had seen running from the residence. Based on the stipulated facts, the district court found Rumold guilty as charged.

The district court held a sentencing hearing in February 2019. The presentence investigation report showed Rumold's criminal history score was a B based on a 2010 Lyon County aggravated burglary conviction and a 2010 Lyon County conspiracy to commit aggravated robbery conviction. Rumold did not object to her criminal history score. Based on this score, the district court sentenced Rumold to 29 months in prison with 12 months of postrelease supervision.

Rumold timely appeals.

*Did the District Court Err in Denying Rumold's Motion to Suppress?*

Rumold first argues that she did not knowingly or voluntarily waive her *Miranda* rights. Rumold asserts that the intensity of the situation, her fear of the officers, and the video's failure to show that she understood her rights weigh against finding her waiver voluntary. She asks us to remand for a new trial excluding her statements.

*Standard of Review*

Our standard of review for a district court's decision on a motion to suppress has two components. First, we review the district court's factual findings to determine whether they are supported by substantial competent evidence. *State v. Parker*, 311 Kan. ___, 459 P.3d 793, 796 (2020). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). In reviewing the factual findings, we do not reweigh the evidence, assess the credibility of witnesses, or resolve conflicting evidence. And, second, we review the ultimate legal conclusion using a de novo standard. *Parker*, 459 P.3d at 796.

*Analysis*

We first determine whether substantial competent evidence supports the district court's factual finding that Rumold responded "yeah" when Rankin asked her if she understood her *Miranda* rights. Rumold contends the district court should have "seriously question[ed]" Rankin's testimony because the body camera audio did not show or reflect her aural response, and Rankin's affidavit portrayed a waiver "much clearer and more explicit than occurred in real life." But on appeal we cannot reweigh the evidence, assess the credibility of witnesses, or resolve conflicting evidence. See *Parker*, 459 P.3d at 796. Rankin's testimony at trial was legal and relevant evidence that a reasonable person could accept as adequate to support the district court's factual finding that Rumold responded "yeah." Thus we accept the district court's finding.

We next address the voluntariness of Rumold's consent. The Fifth Amendment to the United States Constitution protects an individual's right against self-incrimination. *State v. Palacio*, 309 Kan. 1075, 1081, 442 P.3d 466 (2019). This protection is incorporated to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S.

6

1, 6-11, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). Persons interrogated by police while in custody must be told of their *Miranda* rights, which include the right to remain silent. See *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). A court must exclude statements made during a custodial interrogation unless the State shows it used procedural safeguards—*Miranda* warnings—to secure the defendant's privilege against self-incrimination. *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018).

It is undisputed that officers subjected Rumold to custodial interrogation. They asked her about the burglary after they handcuffed and surrounded her. See *Regelman*, 309 Kan. at 59 (identifying factors to use in determining whether an interrogation is investigative or custodial); *State v. Warledo*, 286 Kan. 927, 935-36, 190 P.3d 937 (2008) (stating an interrogation refers to express questioning and its functional equivalent, which means any words or actions that the police should know are reasonably likely to elicit an incriminating response). So the sole issue is whether Rumold's actions were voluntary.

A defendant may waive her *Miranda* rights and choose to speak with the officers. Yet this waiver must be made knowingly, intelligently, and voluntarily. *Parker*, 459 P.3d at 796. The State bears the burden to prove by a preponderance of the evidence the validity of a waiver. *State v. Mattox*, 305 Kan. 1015, 1042, 390 P.3d 514 (2017). To determine whether a defendant made such a waiver, we use a totality of the circumstances test. 305 Kan. at 1042. Our Supreme Court has listed some nonexclusive factors for us to consider when making this determination:

> "(1) the defendant's mental condition; (2) the manner and duration of the interrogation;
> (3) the defendant's ability to communicate with the outside world; (4) the defendant's age,
> intellect, and background; (5) the fairness of the officers in conducting the interrogation;
> and (6) the defendant's proficiency in the English language." 305 Kan. at 1042-43.

Another factor indicating voluntariness is when a defendant says that he or she understands his or her rights and then answers questions. *Parker*, 459 P.3d at 796.

Not all factors weigh equal in this balance:

> "'These factors are not to be weighed against one another with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' [Citation omitted.]" *Mattox*, 305 Kan. at 1043.

We thus apply the totality of the circumstances test to see whether Rumold voluntarily, knowingly, and intelligently waived her *Miranda* rights. First, although Rumold contends she was afraid after being in an intense police encounter, nothing in the record suggests that her mental condition was so diminished that she was "'unusually susceptible'" to police questioning or that she was incapable of intelligently responding to the officer's questions. See *State v. William*, 248 Kan. 389, 410, 807 P.2d 1292 (1991) (stating, for the defendant's mental condition, the evidence did not show the defendant was unusually susceptible to questioning or authority and that the defendant responded to questioning); Ringel, *Searches and Seizures Arrests and Confessions* § 25:14 (2d ed. 2020) (characterizing *mental condition* as a matter of intelligence, intellectual disability, or severely disturbed emotional state). In contrast, the video from the body camera establishes that Rumold was competently able to respond in English to both Rankin's and Dragonas' questions. During this time, Rumold gave a false name and birthdate. As the district court noted, the fact that Rumold managed to work out a strategy, although a deceptive one, about how to handle the situation, shows she could exercise her intelligence and volition.

Second, the officers' interaction with Rumold was neither coercive nor unfair. Although the initial interaction was admittedly intense, the situation deescalated after the

8

officers handcuffed Rumold. She sat calmly on the ground while Rankin talked to her. After Rankin recited the *Miranda* warnings, he asked Rumold twice if she understood them. Rankin testified that she responded, "yeah," and he believed she understood her rights. That testimony is uncontradicted. There is no requirement that officers follow a set protocol to determine whether a defendant understands his or her rights. *Parker*, 459 P.3d at 796-97. And Rumold cites no authority suggesting Rankin's actions were otherwise coercive or unfair.

Third, Rumold's reply, "yeah," and her ensuing responsiveness to Dragonas' questions point toward her voluntarily waiving her *Miranda* rights. See 459 P.3d at 796 (stating an explicit statement that a defendant understands her rights and then answers questions favors a voluntary waiver); *State v. Boyle*, 207 Kan. 833, 841, 486 P.2d 849 (1971) (stating subsequent voluntary responses to inquiries after an initial *Miranda* warning can create an effective waiver).

Fourth, nothing in the record shows the officers limited Rumold's ability to communicate with the outside world.

Under the totality of the circumstances, we find that the State met its burden to prove that Rumold voluntarily, intelligently, and knowingly waived her *Miranda* right to remain silent. We thus affirm the district court's denial of the motion to suppress.

*Is Rumold's Sentence Illegal?*

Rumold next argues that her sentence was illegal because the district court scored her 2010 prior Kansas conviction for aggravated burglary as a person felony rather than a nonperson felony, making her criminal history score incorrect. She asserts that the identical-or-narrower test from *State v. Wetrich*, 307 Kan. 552, 562, 412 P.3d 984 (2018), which we have applied only to out-of-state and pre-KSGA crimes, should also apply to

prior in-state KSGA crimes. She then asserts that the elements of Kansas' aggravated burglary statute have narrowed from 2010 to 2018. Using the *Wetrich* test to compare the two Kansas aggravated battery statutes, she contends that the district court should have scored her 2010 felony as a nonperson felony. Alternatively, Rumold contends that the United States Constitution requires us to use the identical-or-narrower test and reach that same result.

In response, the State asserts that *Wetrich* does not apply because the Legislature has included person/nonperson designations for in-state, KSGA criminal statutes. We agree. Because the Legislature has designated both the 2010 and the 2018 statutes for aggravated burglary as person crimes, using the *Wetrich* test to determine whether a prior KSGA crime is or is not a person crime is unnecessary and unproductive.

*Standard of Review*

Whether a prior conviction should be classified as a person or nonperson offense involves the interpretation of the KSGA. Interpretation of a statute is a question of law over which we have unlimited review. *State v. Keel*, 302 Kan. 560, 571, 357 P.3d 251 (2015). Likewise, whether a sentence is illegal is a question of law over which we have unlimited review. *State v. Lee*, 304 Kan. 416, 417, 372 P.3d 415 (2016).

Wetrich *argument*

*Wetrich* created an identical-or-narrower test of comparability for out-of-state prior crimes:

> "For an out-of-state conviction to be comparable to an offense under the Kansas criminal code, the elements of the out-of-state crime cannot be broader than the elements of the Kansas crime. In other words, the elements of the out-of-state crime must be identical to,

10

or narrower than, the elements of the Kansas crime to which it is being referenced." *Wetrich*, 307 Kan. at 562.

Recently, our Supreme Court extended *Wetrich*'s identical-or-narrower test to prior in-state crimes committed before 1993, the date the KSGA was enacted. *State v. Coleman*, 311 Kan. 305, 309-10, 460 P.3d 368, 371-72 (2020). *Coleman* extended *Wetrich* to Kansas crimes committed before 1993 because those crimes lacked a person or nonperson designation.

> "For a Kansas crime committed before Kansas designated crimes as person or nonperson offenses to be deemed comparable to a current offense under the Kansas criminal code, within the meaning of K.S.A. 2018 Supp. 21-6810, the earlier crime's elements cannot be broader than the current crime's elements. In other words, the earlier crime's elements must be identical to, or narrower than, the elements of the crime to which it is being referenced." *Coleman*, 311 Kan. 305, Syl. ¶ 2.

Rumold now asks us to expand *Wetrich*'s test even further—to prior Kansas crimes that do have a person or nonperson designation. Under Rumold's approach, a crime the Legislature has designated a person crime may still be found to be a nonperson crime when the elements of the prior crime were broader than the elements of the same crime at the time of the current conviction. So even though the Legislature stated in 2010 that "Aggravated burglary is a severity level 5, person felony," K.S.A. 2010 Supp. 21-3716, and the Legislature stated in 2018 that "Aggravated burglary . . . is a . . . person felony," K.S.A. 2018 Supp. 21-5807(c)(2), Rumold thinks not.

Rumold's *Wetrich* claim is nearly identical to one another panel of our court recently rejected. In *State v. Lyon*, No. 120,993, 2020 WL 4250685, at *12 (Kan. App. 2020), the panel held:

> "when a conviction of a prior crime occurs post-implementation of the KSGA, as a matter of practical application, the classification of person or nonperson felony determined at the

11

time of the new conviction will be the same as the classification of the prior crime on the date of its commission unless the Legislature has changed the classification of the crime, *Keel,* 302 Kan. at 573, or the statute has been ruled unconstitutional."

The Legislature has not changed the classification of Rumold's crime—aggravated battery was a person crime in 2010 and remained a person crime in 2018. Nor has the aggravated battery statute been ruled unconstitutional.

*Lyon* reasoned as follows:

- The plain language of the KSGA shows that *Wetrich*'s identical-or-narrower test does not apply to post-KSGA convictions (Kansas convictions after 1993). For post-KSGA convictions, the Legislature set out person and nonperson classifications in the applicable Kansas criminal statute. In contrast, pre-KSGA and out-of-state convictions have no person or nonperson designation so courts must use a comparability test to determine how to classify the prior conviction.

- The Legislature limited the comparability approach in K.S.A. 2017 Supp. 21-6810(d) and K.S.A. 2017 Supp. 21-6811(e)(3) to pre-KSGA offenses and out-of-state offenses. This shows the Legislature did not intend to apply the identical-or-narrower comparison approach to post-KSGA offenses.

- Whether the 2010 aggravated burglary statute was repealed rather than amended matters not because the result would be the same either way. If the recodification and/or amendments of the aggravated burglary statute amounted to a repeal, the district court properly scored the prior conviction as a person felony because aggravated burglary was a person felony when Lyon committed that crime in 2010. See K.S.A. 2017 Supp. 21-6810(d)(8) (stating, "Prior convictions of a crime defined by a statute that since has been repealed shall be scored using the classification assigned at the time of such conviction."). On the other hand, if the

12

statute was merely recodified or amended and was not repealed, the prior crime was a person felony because all forms of aggravated burglary were a person felony in 2017 when Lyon committed his current crimes.

We find *Lyon* to be well reasoned, and we adopt its rationale here. *Wetrich* does not apply to determine whether Rumold's 2010 Kansas conviction for aggravated battery was a person crime. The purpose of the comparability analysis is to determine whether a sentencer should score a prior crime as a person crime or a nonperson crime. We have no need to do a comparability analysis when our Legislature has stated that the crime is a person or a nonperson crime. In 2010, the Kansas Legislature designated aggravated burglary as a person crime. It did the same in 2018. Even though the elements of Kansas aggravated battery were narrower in 2018 than they were in 2010, Rumold has not persuaded us that her prior crime of aggravated battery was a nonperson crime.

*Constitutional argument*

Alternatively, Rumold raises an issue not addressed in *Lyon*—that the United States Constitution compels us to use the identical-or-narrower test, citing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), *Descamps v. United States*, 570 U.S. 254, 133 S. Ct. 2276, 186 L. Ed. 2d 438 (2013), and *Mathis v. United States*, 579 U.S. ___,136 S. Ct. 2243, 195 L. Ed. 2d 604 (2016). Rumold concedes that the United States Supreme Court has never held that the Constitution compels use of the identical-or-narrower test, but she contends that it so "signaled" in *Mathis*. The State counters that because no judicial fact-finding is necessary, these cases do not apply.

We set forth the bulk of Rumold's constitutional argument here:

"In accordance with *Mathis*, *Descamps*, and *Apprendi*, . . . the Sixth Amendment mandates the use of the identical-or-narrower test in this case . . . . The Sixth Amendment

13

guarantees Ms. Rumold the right to have a jury decide whether the facts of her 2010 Kansas aggravated burglary conviction equal facts meeting the elements of a 2018 Kansas aggravated burglary. See *Mathis*, 136 S. Ct. at 2246, 2252. Otherwise, her rights have been violated by judicial fact-finding. Since the facts of the 2010 conviction were not put before a jury, the identical-or-narrower test is the only constitutionally approved test that may be used to enhance [her] sentence.

"On constitutional or statutory grounds, Kansas courts must operate under the identical-or-narrower test when determining comparability of past in-state crimes pursuant to *Keel*'s mandate that comparability be analyzed at the time of the current crime of conviction."

We reject this argument on several grounds. First, as we have found above, no comparability analysis needs to be done or should be done for in-state crimes committed after 1993. As to those crimes, the Legislature's designation of the crime as a person crime or a nonperson crime is controlling. And the Legislature's designation here is that aggravated burglary is and was a person crime.

Second, Rumold fails to show that making this person/nonperson determination entails any judicial fact-finding. The district court need only read the 2010 aggravated burglary statute and the 2018 aggravated burglary statute and see the Legislature's designation of this crime as a person crime to reach the simple result. By so doing, the district court does not remove from the jury the assessment of facts that increase the prescribed range of penalties to which Rumold is exposed. The judge is merely identifying the crime of conviction, not exploring how the defendant committed the crime. And the mere fact that Rumold was convicted in 2010 of aggravated battery need not be proved to a jury. See *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002).

Third, Rumold fails to show how *Apprendi*, *Descamps*, or *Mathis* applies to this issue. In *Apprendi,* the defendant pleaded guilty to second-degree possession of a firearm,

which was punishable by a term of imprisonment of between 5 and 10 years. But the judge sentenced him to 12 years of imprisonment under a statute that authorized an enhanced sentence of 10 to 20 years if the sentencing judge found, by a preponderance of the evidence, that the crime was motivated by racial bias. The Supreme Court reversed, holding that under the Due Process Clause of the Fourteenth Amendment to the Federal Constitution:  "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. See *Alleyne v. United States*, 570 U.S. 99, 103, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013) (finding any fact that increases the mandatory minimum sentence for a crime is an element of the crime rather than a sentencing factor that must be submitted to jury).

But Rumold fails to show that a judge's use of the legislative person designation requires the judge to determine any fact about her prior conviction. And Rumold asserts a violation of the Sixth Amendment (which guarantees "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury"), not the Fourteenth, as in *Apprendi*. Rumold cites no caselaw applying *Apprendi* to comparable facts. As a result, Rumold does not show that *Apprendi* should apply.

In *Descamps*, the defendant was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), an offense which ordinarily carries a statutory maximum penalty of 10 years in prison. But Descamps got an Armed Career Criminal Act (ACCA) enhancement and was sentenced to 262 months in prison—more than twice the maximum penalty he otherwise could have received. On appeal, he argued that his prior convictions did not count as prior violent felony predicates for purposes of the ACCA sentencing enhancement.

The ACCA criminalizes the possession of a firearm by a convicted felon. 18 U.S.C. § 922(g). And it increases the penalty for repeat offenders from a 10-year

15

maximum penalty to a 15-year minimum penalty. 18 U.S.C § 924(e)(1). So a defendant who violates § 922(g) and has three previous convictions under § 922(g)(1) for a violent felony or a serious drug offense, or both, committed on different occasions, shall be imprisoned at least 15 years. 18 U.S.C. § 924(e).

The ACCA lists certain felonies that necessarily count as violent felonies, such as burglary, arson, and extortion, but it does not define those crimes, and states' definitions vary. So the Supreme Court construes the ACCA as incorporating the modern "generic" version of such offenses, and holds that only prior convictions falling within the generic version of the offense could count as ACCA predicate crimes. To determine whether a prior conviction falls within the generic version of the offense, sentencing courts use a "categorical approach," analyzing the statutory definition of the offense of conviction rather than the facts of the particular case. If that offense swept no more broadly or was narrower than the generic version of the offense, then a conviction for the prior offense *categorically* would count as an ACCA predicate felony. But when a statute sweeps more broadly than the generic version of the offense, a sentencing court may sometimes engage in "modified categorical review," meaning it can consult certain materials to determine whether the prior conviction was for conduct falling within the generic version of the offense. See Roth, *The Divisibility of Crime*, 64 Duke L.J. Online 95, 100 (2015).

*Descamps* asked when such modified categorical review was appropriate. *Descamps* held that modified categorical review was permissible only when the prior conviction was under a "divisible" rather than an "indivisible" statute, meaning that the statute explicitly set forth "alternative elements," some of which fell within the generic offense and others of which did not. 570 U.S. at 261-64.

Rumold cites *Descamps* for the proposition that the "identical-or-narrower test, a strict comparison of the elements, is then used to determine the applicability of the prior

conviction because to do anything else would be to violate *Apprendi* by looking to the facts making up the prior conviction. *Descamps*, 570 U.S. at 257, 263-64, 277-78."
But this language does no more for Rumold than *Apprendi* does, which we have found inapplicable above. And Rumold fails to show how *Descamps*' predicate crimes analysis necessary for an ACCA sentencing enhancement applies here. Her case involves neither a predicate crime, nor the ACCA, nor any sentencing enhancement comparable to the ACCA's. Rather, her prior crime was used as a mere sentencing factor. Rumold cites no cases applying *Descamps* to comparable facts. So Rumold does not show that *Descamps* applies here.

Similarly, in *Mathis*, the defendant pleaded guilty to being a felon in possession of a firearm, and received a 15-year mandatory minimum sentence under the ACCA based on his five prior convictions for burglary under Iowa law. *Mathis* asked "whether ACCA's general rule—that a defendant's crime of conviction can count as a predicate only if its elements match those of a generic offense—gives way when a statute happens to list various means by which a defendant can satisfy an element." 136 S. Ct. at 2251. *Mathis* reaffirmed longstanding Supreme Court precedent establishing that, in determining whether a prior crime *counts as a predicate crime* of violence under the ACCA, a court uses a "categorical approach," looking not to the facts of the prior crime but to the statutory elements of the prior conviction.

> "For more than 25 years, we have repeatedly made clear that application of ACCA involves, and involves only, comparing elements. Courts must ask whether the crime of conviction is the same as, or narrower than, the relevant generic offense. They may not ask whether the defendant's conduct—his particular means of committing the crime— falls within the generic definition. And that rule does not change when a statute happens to list possible alternative means of commission: Whether or not made explicit, they remain what they ever were—just the facts, which ACCA (so we have held, over and over) does not care about." *Mathis*, 136 S. Ct. at 2257.

Rumold fails to show that the ACCA's predicate crimes analysis applies here where neither a predicate crime nor the ACCA is involved. She cites no cases applying *Mathis* to a case such as hers, where a prior crime is used merely as a sentencing factor. Rumold has stretched these cases beyond their bounds.

*Mathis* stated three reasons for adhering to an elements-only inquiry in ACCA enhancement cases: textual, constitutional, and fairness. We set forth all three reasons for completeness, although Rumold relies only on the second:

> "First, ACCA's text favors that approach. By enhancing the sentence of a defendant who has three 'previous convictions' for generic burglary, § 924(e)(1)—rather than one who has thrice committed that crime—Congress indicated that the sentencer should ask only about whether 'the defendant had been convicted of crimes falling within certain categories,' and not about what the defendant had actually done. *Taylor*, 495 U.S. at 600. Congress well knows how to instruct sentencing judges to look into the facts of prior crimes: In other statutes, using different language, it has done just that. See *United States v. Hayes*, 555 U.S. 415, 421, 129 S. Ct. 1079, 172 L. Ed. 2d 816 (2009) (concluding that the phrase 'an offense . . . committed' charged sentencers with considering non-elemental facts); *Nijhawan v. Holder*, 557 U.S. 29, 36, 129 S. Ct. 2294, 174 L. Ed. 2d 22 (2009) (construing an immigration statute to 'call[ ] for a "circumstance-specific," not a "categorical" interpretation'). But Congress chose another course in ACCA, focusing on only 'the elements of the statute of conviction.' *Taylor*, 495 U.S. at 601.

> "Second, a construction of ACCA allowing a sentencing judge to go any further would raise serious Sixth Amendment concerns. This Court has held that only a jury, and not a judge, may find facts that increase a maximum penalty, except for the simple fact of a prior conviction. See *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). That means a judge cannot go beyond identifying the crime of conviction to explore the manner in which the defendant committed that offense. See *Shepard*, 544 U.S. at 25 (plurality opinion); *id.*, at 28, 125 S. Ct. 1254 (THOMAS, J., concurring in part and concurring in judgment) (stating that such an approach would amount to 'constitutional error'). He is prohibited from conducting such an inquiry

18

himself; and so too he is barred from making a disputed determination about 'what the defendant and state judge must have understood as the factual basis of the prior plea' or 'what the jury in a prior trial must have accepted as the theory of the crime.' See *id.*, at 25, 125 S. Ct. 1254 (plurality opinion); *Descamps*, 570 U.S., at __, 133 S. Ct. at 2288. He can do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.

"And third, an elements-focus avoids unfairness to defendants. Statements of 'non-elemental fact' in the records of prior convictions are prone to error precisely because their proof is unnecessary. 133 S. Ct., at 2288-2289. At trial, and still more at plea hearings, a defendant may have no incentive to contest what does not matter under the law; to the contrary, he 'may have good reason not to'—or even be precluded from doing so by the court. When that is true, a prosecutor's or judge's mistake as to means, reflected in the record, is likely to go uncorrected. Such inaccuracies should not come back to haunt the defendant many years down the road by triggering a lengthy mandatory sentence." *Mathis*, 136 S. Ct. at 2252-53.

We focus, as Rumold does, solely on the constitutional argument. But *Mathis*' constitutional argument is based on *Apprendi* and does not help Rumold any more than *Apprendi* itself does. In sentencing Rumold, the district court made no disputed determination about the facts. The district court found no facts that increase a maximum penalty, except for the simple fact of a prior conviction that *Apprendi* permits. Consistent with the Sixth Amendment, the district court solely determined what crime, with what elements, Rumold was convicted of. That easily withstands constitutional muster.

We find no error in the district court's scoring Rumold's 2010 Kansas aggravated battery conviction as a person crime.

19

*Did the District Court Violate Section 5 of the Kansas Constitution Bill of Rights?*

Finally, Rumold argues that the KSGA's mandate to include prior criminal convictions in calculating a defendant's sentence is unconstitutional. Here, she relies on the right to a jury trial under section 5 of the Kansas Constitution Bill of Rights, which states "[t]he right of trial by jury shall be inviolate." She contends this section precludes the district court from using her prior convictions to elevate the permissive punishment for the current crime of conviction, unless evidence of the prior conviction is presented to and determined by a jury. Rumold asserts this preclusion existed in American common law at the time the Kansas Constitution was adopted so it should be read into our Bill of Rights. "'Section 5 preserves the jury trial right as it historically existed at common law when our state's constitution came into existence.'" *State v. Love*, 305 Kan. 716, 734, 387 P.3d 820 (2017). Seizing this rule, Rumold argues that the common law required the State to prove a defendant's criminal history to a jury when the Kansas Constitution began, and thus the KSGA—which allows a judge to find criminal history—is unconstitutional under section 5. She asks this court to vacate her sentence and remand with instructions to resentence her with a criminal history score of I.

*Preservation*

The State first argues that Rumold did not properly preserve this claim. Under Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34), an appellant must point to the specific location in the record where she raised the issue being appealed and where the court ruled on that issue. If an issue was not raised in the trial court, it cannot be raised on appeal. See *State v. Williams*, 298 Kan. 1075, 1085-86, 319 P.3d 528 (2014). This rule applies to alleged constitutional violations as well. See *State v. Godfrey*, 301 Kan. 1041, 1043-44, 350 P.3d 1068 (2015). The rationale behind error preservation is simple: a trial court cannot wrongly decide an issue never presented to it. See *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003).

Yet we have recognized three exceptions to this rule:

> "'[A]ppellate courts may consider constitutional issues raised for the first time on appeal if the issue falls within one of three recognized exceptions: (1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason. [Citations omitted.]'" *Godfrey*, 301 Kan. at 1043.

The party asserting an issue for the first time on appeal must invoke an exception and explain why the issue is properly before the court. *Godfrey*, 301 Kan. at 1043; Kansas Supreme Court Rule 6.02(a)(5).

But even when a party properly explains why an exception applies, the decision to review an unpreserved claim under an exception is a prudential one. So even when an exception supports a decision to review a new claim, we have no obligation to do so. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020).

Rumold concedes that she did not raise this issue in the district court. Yet she asserts the first two exceptions above. We focus on her argument that review of her claim is necessary to prevent the denial of her fundamental right to a jury trial, citing *Gard v. Sherwood Const. Co.*, 194 Kan. 541, 549, 400 P.2d 995 (1965) (stating section 5's right to a jury trial is a fundamental feature of American jurisprudence and should be carefully guarded). The State responds that Rumold's reliance on this exception seems misplaced because she waived her right to a jury trial and agreed to try the case to the bench on stipulated facts. Although the State may be correct, it cites no authority in support of this assertion. We find that Rumold has sufficiently brought her claim within the second exception, and we choose to review the merits.

*Standard of Review*

The constitutionality of a sentencing statute is a question of law subject to unlimited appellate review. *State v. Moore*, 302 Kan. 685, 708, 357 P.3d 275 (2015).

*Analysis*

Rumold contends that it is unconstitutional for a district court to use her prior convictions to elevate the permissive punishment for the current crime of conviction, without presenting evidence of her prior convictions to a jury. She concedes that her argument fails under the United States Constitution. See *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Ivory*, 273 Kan. at 46-48. So Rumold asserts the same right under the Kansas Constitution.

But our court has recently rejected Rumold's argument under our state Constitution. *State v. Albano*, 58 Kan. App. 117, Syl. ¶ 4 , 464 P.3d 332, 339-44 (2020);see *State v. Billoups*, No. 120,040, 2020 WL 1969356, at *17-20 (Kan. App. 2020) (unpublished opinion) (rejecting the argument that § 5 is broader than the Sixth Amendment); *State v. Valentine*, No. 119,164, 2019 WL 2306626, at *6 (Kan. App.) (unpublished opinion) (same), *rev. denied* 310 Kan. 1070 (2019).

Rumold's argument is identical to the arguments this court rejected in *Albano*. In *Albano*, the defendant challenged the KSGA's use of judicial findings of prior convictions, claiming a violation of the Kansas Constitution. The *Albano* panel rejected Albano's section 5 argument for two reasons. First, Albano showed no authority to support her assertion that section 5 provides greater protection than the federal jury trial right, which does not require a jury to determine prior convictions. 58 Kan. App. 2d at

126; see also *Valentine*, 2019 WL 2306626, at \*6  (rejecting same challenge to KSGA and finding appellant failed to show section 5 provided greater protection than federal jury trial right).

Second, the *Albano* panel found her argument failed under a section 5 analysis. 58 Kan. App. 2d at 129. The *Albano* panel explained that under a section 5 analysis, "the jury trial right in section 5 '"applies no further than to give the right of such trial upon issues of fact so tried at common law."'" 58 Kan. App. 2d at 129. The panel then examined the authority Albano relied on to show that at common law prior convictions had to be found by a jury, not a judge—the same authority Rumold cites. The panel found the authorities did not show a common-law right to have a jury find prior convictions. Instead, the "authorities suggest that at best there was a historical split on whether prior convictions must be proven to a jury. . . . Neither side definitively identifies an established common law rule about who needed to make [prior conviction] findings." 58 Kan. App. 2d at 133.

The panel then examined Kansas caselaw and found that early in our state's history, the Kansas Supreme Court recognized the split of authorities on whether prior convictions must be proven to a jury and concluded that "'[i]n this state it is no concern of the jury what the penalty for a crime may be, and it is just as well that the jurors' minds should not be diverted from the question of defendant's innocence or guilt by facts concerning defendant's prior convictions of other felonies.'" 58 Kan. App. 2d at 133. (quoting *State v. Woodman*, 127 Kan. 166, 172, 272 P. 132 [1928]). The panel also cited *Levell v. Simpson*, 142 Kan. 892, 894, 52 P.2d 372 (1935), where the Kansas Supreme Court stated that "[the defendant] had no such privilege under Kansas law" when the defendant argued he had a right under the state and federal constitutions to have a jury determine whether he had prior convictions. Based on this authority, the *Albano* panel concluded Albano's argument failed under a section 5 analysis—she did not establish a common-law right to have a jury determine prior convictions and Kansas has always held

23

that a defendant does not have a state constitutional right to have a jury determine prior convictions. 58 Kan. App. 2d at 134.

We agree with *Albano* that we should not interpret section 5 more broadly than we do its federal counterpart. The general rule in Kansas is that we interpret the Kansas Constitution similarly to its federal counterpart even though the language may differ. See *State v. Lawson*, 296 Kan. 1084, 1091, 297 P.3d 1164 (2013) ("But, at least for the past half-century, this court has generally adopted the United States Supreme Court's interpretation of corresponding federal constitutional provisions as the meaning of the Kansas Constitution, notwithstanding any textual, historical, or jurisprudential differences."). Kansas caselaw supports courts interpreting section 5 similarly to the Sixth Amendment to the United States Constitution. See *Albano*, 58 Kan. App. 2d at 129.

And Rumold fails to provide convincing evidence that a common-law right existed to have a jury determine one's criminal history when the Kansas Constitution was adopted. See *Albano,* 58 Kan. App. 2d at 129-34. Rumold relies on *Tuttle v. Commonwealth*, 68 Mass. 505, 506 (1854), and *Hines v. State*, 26 Ga. 614, 616 (1859), as support for her argument that a common-law rule precludes a district court from using a defendant's prior crimes in calculating a sentence. But *Tuttle* and *Hines* examined recividist statutes, which increased the penalty for a defendant's second offense under the same statute. See *Apprendi*, 530 U.S. at 506-08 (Thomas, J., concurring) (alluding to *Tuttle* and *Hines* as early cases addressing recidivism statutes). Rumold shows no reason why those cases should apply to her simple prior crime.

*Tuttle* found that when a statute imposes a higher penalty upon a second and a third conviction, respectively, it makes the prior conviction of a similar offense a part of the description and character of the offense intended to be punished, so the fact of such prior conviction must be proved. *Tuttle*, 68 Mass. at 506.

24

Similarly, *Hines* held that when an indictment for selling liquor alleged that it was the defendant's second violation of that statute, the existence of the first offense had to be found by the jury, and not the court, in proving the second offense. *Hines*, 26 Ga. at 616.

> "The offence charged against Hines, was charged as a second offence. The Court told the jury, 'that no proof of a former conviction, was necessary.' The jury found a general verdict of 'guilty.' Afterwards, the Court itself heard evidence, as to whether the offence was a second one, and on that evidence came to the conclusion, that it was, and sentenced Hines to a punishment much too great for any but a second offence.
>
> "We think, that the question, whether the offence was a second one, or not, was a question for the jury. In every such question, identity is involved, and that, beyond a doubt, is a matter for the jury. Nor is it meant, that all the other matters involved in the question, may not also be for the jury. It is a general principle, that whatever it is necessary to allege, it is necessary to prove." *Hines*, 26 Ga. at 616.

Statutes like those at issue in *Tuttle* and *Hines* speak to predicate crimes, where evidence of the prior conviction is a necessary element of the crime of current conviction. See *State v. Gill*, 26 Kan. App. 2d 127, 128, 980 P.2d 591 (1999) (finding evidence of a prior felony conviction is a necessary element of the charge of criminal possession of a firearm under K.S.A. 21-4204[a][2]), *rev'd on other grounds*, 268 Kan. 247, 997 P.2d 710 (2000). The early statutes in *Tuttle* and *Hines* find their modern-day counterpart in sentence-enhancing recidivist laws, such as the ACCA. Yet Rumold was not sentenced under a habitual felon, career criminal, or other recidivist statute comparable to the ACCA. And neither *Tuttle* nor *Hines* speaks to the more typical use of prior crimes, as used here, as simply one factor in determining a defendant's sentence under a non-recidivist statute.

Rumold provides no other authority or argument that undermines the *Albano* panel's analysis on this issue. For these reasons, we hold that the KSGA is not unconstitutional under section 5 of the Kansas Constitution Bill of Rights.

25

Affirmed.